UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PATRICIA BUSH, Representative of the
Estate of Charles Bush,

    Plaintiff,

    v.

WASHINGTON METROPOLITAN
AREA TRANSIT AUTHORITY,

    Defendant.

Civil Action No. 19-930 (JEB)

## MEMORANDUM OPINION

One evening in November of 2016 here in Washington, 83-year-old Charles Bush was on his way home, traveling on a Washington Metropolitan Area Transit Authority paratransit van, which transports disabled passengers. Upon arriving at his Southwest D.C. residence, Bush exited the vehicle with a walker and proceeded toward his driveway. Unfortunately, he tripped, fell to the ground, and fractured his hip. He died three months later. His daughter, Plaintiff Patricia Bush, as representative of his estate, sued the Authority, asserting three negligence-based claims. In response, WMATA has now moved for summary judgment across the board, maintaining that Plaintiff cannot prove a case of negligence. Specifically, Defendant argues that Bush has not established a jury question on what standard of care it was obligated to follow, how it deviated from that standard, and that such deviation caused her father's broken hip. Agreeing with Defendant on at least the first two, the Court will grant its Motion.

**I.    Background**

For reasons explained more fully below, the Court draws its facts largely from WMATA's submissions. On November 30, 2016, Charles Bush went to the Washington

1

Hospital Center for a routine dialysis treatment. See ECF No. 19 (Def. MSJ), Statement of Material Facts, ¶ 2; id., Exh. D (Deposition of Patricia Bush) at 23:18–22. At the end of the session, a WMATA MetroAccess van picked him up and drove him home. See Def. SMF, ¶¶ 1–3. For those unfamiliar with this service, MetroAccess offers door-to-door transportation to disabled passengers like Bush, who relies on a walker to get around. Id., ¶ 2; ECF No. 6 (Def. Answer), ¶ 12.

Upon arriving at Bush's residence, WMATA operator Jenein Smith opened the van door and lowered the ramp to allow him to exit. Id., ¶ 3 (citing Exh. C (Road Supervisor Incident Report) at WMATA_33; Exh. B (Jenein Smith Incident Report) at WMATA_31). When he stepped out, Smith asked him to wait for her to secure the vehicle. Id. (citing Smith Rep. at WMATA_31; Supervisor Rep. at WMATA_33). Bush disregarded that instruction and proceeded up the driveway unescorted. Id. (citing Smith Rep. at WMATA_31; Supervisor Rep. at WMATA_33). By the time Smith realized that Bush was gone, he had already entered a patch of grass adjacent to the pavement. Id., ¶ 4 (citing Smith Rep. at WMATA_31; Supervisor Rep. at WMATA_33). In her telling, he then tripped on the walker and fell on the left side of his body. Id. (citing Smith Rep. at WMATA_31; Supervisor Rep. at WMATA_33).

While on the ground, Bush told Smith that he felt a pain creeping into his legs. See Smith Rep. at WMATA_31. Moments later, a bystander approached, but his efforts to help Bush up were in vain. Id. Emergency personnel then arrived at the scene and transported him to a nearby hospital, where he received further treatment. See Supervisor Rep. at WMATA_33–34. A medical evaluation there revealed a hip fracture. See Def. MSJ, Exh. E (Dr. Keith Lawhorn Expert Report) at 1.

Two days later, Bush underwent surgery to repair his broken hip, but his condition only spiraled downward. Id. Following the procedure, he faced a number of other medical complications and found himself in and out of the hospital. Id. at 1–2. He never fully recovered. On February 20, 2017, nearly three months after the incident, he passed away. See Dr. Lawhorn Rep. at 2; ECF No. 21 (Pl. Opposition), Exh. 8 (Charles Bush Certificate of Death). According to his death certificate, he died of heart and kidney complications. See Bush Certificate.

The decedent's daughter, Patricia Bush, contends that WMATA is at fault. Her father told her as much when they discussed the incident prior to his death. See, e.g., Bush Depo. at 43:21–44:3, 100:11-19, 101:3–7. Acting as the personal representative of his estate, she therefore sued the Authority and Jane Doe — an unnamed WMATA employee who may be Smith — in D.C. Superior Court in February 2019. See Def. MSJ, Exh. A (Sup. Ct. Compl.). She pursued claims under the District's Wrongful Death Act, D.C. Code § 16-2701, and its Survival Act, D.C. Code § 12-101, as well as an underlying common-law negligence claim. Id., ¶¶ 32–51 (Counts I–III). Not long after, the Authority removed the case here under D.C. law, which permits actions brought against it to be removed to federal court. See ECF No. 1 (Notice of Removal), ¶ 4 (citing D.C. Code § 9-1107.10). It has now moved for summary judgment on all counts.

## II. Legal Standard

Summary judgment must be granted "if the movant shows that there is no dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it can affect the substantive outcome of the litigation. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006). A dispute is "genuine" if the evidence is such that a reasonable jury could

3

return a verdict for the non-moving party. See Scott v. Harris, 550 U.S. 372, 380 (2007); Holcomb, 433 F.3d at 895.

When a motion for summary judgment is under consideration, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Liberty Lobby, 477 U.S. at 255 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970)). The nonmoving party's opposition, however, must consist of more than mere unsupported allegations. See Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 323–24 (1986). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record," such as affidavits, declarations, or other evidence. See Fed. R. Civ. P. 56(c)(1). If the non-movant's evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. Liberty Lobby, 477 U.S. at 249–50.

## III.    Analysis

The first order of business is to determine whether Jane Doe is properly before this Court. According to WMATA, Plaintiff never properly served Doe. See ECF No. 22 (Def. Reply) at 8 n.1. If true, that alone would be grounds for dismissal. See Fed. R. Civ. P. 4(m); Candido v. Dist. of Columbia, 242 F.R.D. 151, 160 (D.D.C. 2007). Even if she had effected service, however, Bush faces a statutory hurdle. To wit, D.C. law provides that WMATA is liable for the torts of its employees, and the exclusive remedy is suit against the Authority. See D.C. Code § 9-1107.01(80). Because WMATA's employee is immune from suit, the Court will dismiss the Complaint against her, rendering WMATA the only Defendant in this case. Before turning to the merits of Bush's claims against the Authority, the Court will address a procedural defect Defendant points out.

4

A. Procedural Challenge

Litigants before this Court are not only expected to follow its Local Rules, they are "duty bound" to do so. Texas v. United States, 798 F.3d 1108, 1114 (D.C. Cir. 2015) (quoting In re Jarvis, 53 F.3d 416, 422 (1st Cir. 1995)). Defendant argues that Bush has failed to comply with this injunction. Specifically, WMATA charges Bush with flouting Local Rule 7(h), which governs litigants' conduct in summary-judgment pleadings. That rule has two components. A party that moves for summary judgment must, along with its motion, submit a "statement of material facts" as to which it contends there is no genuine issue. See LCvR 7(h)(1). In similar fashion, the opposing party must submit a "separate concise statement of genuine issues" that sets forth "all material facts" that it believes remain in dispute. Id. It may then provide its own counterstatement of facts. Id. Applicable to both sides is a requirement that the statement "include references to the parts of the record relied on to support [it]." Id.

WMATA argues that Plaintiff has fallen short of her obligation — namely, by not backing her purported disputed facts with any record citations. See Def. Reply at 2–7; see also Fed. R. Civ. P. 56(c) (requiring support for assertions with citations to record materials). A quick glance at Bush's Statement of Genuine Issues confirms that Defendant is right on this score. At the outset, it bears noting that Plaintiff concedes the truth of all but one of Defendant's enumerated Material Facts. See Pl. Opp. at 10–11. In addition, Bush offers four factual statements of her own that she believes are genuinely in dispute. Id. at 11. Yet, she does not include a single record cite in her Statement. Id. at 10–11. Such a deficiency is ordinarily cause for sanction, and under Local Rule 7(h), this Court may treat Defendant's facts as established by concession. See LCvR 7(h) (movant's material facts are admitted unless disputed in opposing party's statement of genuine issues and supported by record evidence).

5

Even if the Court turned a blind eye to its Rules, it would still find Bush's factual statements wanting. Indeed, a thorough combing of the parties' submissions reveals a compendium of infirmities with her five purportedly disputed facts. To begin with, two of them present questions of law, not fact. See Pl. Opp. at 11, ¶ 1 ("Defendant [WMATA] owed a duty to Mr. Bush."); id., ¶ 2 ("Mr. Bush enjoyed a special relationship with the Defendant."). The third statement is not actually in dispute. To be specific, she maintains that WMATA "was required to provide door-to-door service to its Metro Access [*sic*] customers." Id., ¶ 3. Defendant, for its part, has already admitted this responsibility at several junctures. See, e.g., Def. Ans., ¶ 12; Def. SMF, ¶¶ 2–3; Def. Reply at 6.

As to the fourth, Plaintiff makes an unsupported assertion. In her statement, she alleges that driver Smith "failed to give the time and attention to [her father] as he exited the . . . [b]us as her back was to [him]." Pl. Opp. at 11, ¶ 4. She presses a similar contention in her Opposition brief and cites Smith's incident report as evidence. Id. at 1 (citing Smith Rep.). To be sure, Smith acknowledged that her back was turned to Bush the moment that he began to fall. See Smith Rep. at WMATA_31; Def. Reply at 7. Missing from her account, however, are any facts that could create an inference that she did not give him "time and attention." Nothing in the report — or in any of the other materials in the record for that matter — backs this allegation.

As to the fifth issue, Bush points to no evidence to support her characterization of the following WMATA statement as "disputed": "By the time the MetroAccess driver noticed Mr. Bush had not obeyed her instruction, Mr. Bush had entered a grassy area adjacent to the pavement and fell, fracturing his hip." Def. SMF, ¶ 4; see Pl. Opp. at 10, ¶ 4. Nowhere in her Opposition does she challenge this statement directly. Nor does she question any of Defendant's supporting evidence — *i.e.*, the driver- and supervisor-incident reports — for it.

6

As a result, the Court will treat as admitted all of WMATA's facts. This approach is especially proper here, given that the only support for Plaintiff's account of the facts is derived from remarks that her father made to her before he died. See, e.g., Bush Depo. at 44:2–3 ("Only thing I know is what my father told me."); 100:11–19 ("[M]y father didn't get fair treatment getting off that bus. He wasn't assisted getting off that bus like he should have been. He shouldn't have never fell . . . ."); 101:5–7 ("Because he was always complain how they — you know, they — when you get old, how people treat you . . . ."). Bush wisely does not dispute that her father's statements are inadmissible hearsay. See Fed. R. Evid. 802. Because they are inadmissible, it follows that Plaintiff cannot rely on them to create a dispute of material fact. See United States ex rel. Barko v. Halliburton Co., 241 F. Supp. 3d 37, 53 (D.D.C.), aff'd, 709 F. App'x 23, 24–25 (D.C. Cir. 2017) (explaining that no genuine dispute of material fact was created where none of proffered evidence was admissible). With that in mind, the Court can now move on to the merits of Bush's claims.

B. Merits

Under D.C. law, negligence resulting in death may give rise to two separate claims: one under the Wrongful Death Act and another under the Survival Act. See Strother v. Dist. of Columbia, 372 A.2d 1291, 1295 (D.C. 1977). The former "allows recovery for pecuniary loss to the decedent's next of kin (*e.g.*, loss of support) occasioned by death," id., whereas the latter permits recovery "of that which the deceased would have been able to recover had he lived." Burton v. United States, 668 F. Supp. 2d 86, 109 (D.D.C. 2009). Here, Plaintiff advances both types of actions, as well as a stand-alone common-law negligence claim. See Compl., ¶¶ 32–51.

To recover under any of these theories, she must establish a *prima facie* case of negligence. Dist. of Columbia v. Perez, 694 A.2d 882, 884–86 (D.C. 1997). To do so, she must

7

prove: "(1) that the defendant was owed a duty to the plaintiff, (2) breach of that duty, and (3) injury to the plaintiff that was proximately caused by the breach." Coates v. WMATA, 297 F. Supp. 3d 69, 72 (D.D.C. 2018) (quoting Night & Day Mgmt., LLC v. Butler, 101 A.3d 1033, 1038 (D.C. 2014)).

In moving for summary judgment, Defendant argues that Bush has not created a jury question as to any of these elements. For one thing, WMATA maintains, Plaintiff has not set out the applicable standard of care governing the duty that the Authority owes its MetroAccess passengers. See Def. MSJ at 7–10. Without that standard, the argument goes, Bush cannot prove that WMATA breached that duty. Id. As Defendant is correct, the Court need not look at causation.

In negligence cases, a plaintiff bears the burden of establishing the applicable standard of care. See Dist. of Columbia v. Harris, 770 A.2d 82, 90 (D.C. 2001). As a general rule, she must present expert testimony to do so. See Robinson v. WMATA, 941 F. Supp. 2d 61, 67 (D.D.C. 2013); Dist. of Columbia v. Peters, 527 A.2d 1269, 1273 (D.C. 1987). D.C. courts, however, recognize a partial exception to that rule: no such testimony is necessary if "the subject matter is within the realm of common knowledge and everyday experience." Briggs v. WMATA, 481 F.3d 839, 845 (D.C. Cir. 2007) (quoting Hill v. Metro. African Methodist Episcopal Church, 779 A.2d 906, 908 (D.C. 2001)). That said, this exception "is recognized only in cases in which everyday experience makes it clear that jurors could not reasonably disagree over the care required." Id. (canvassing D.C. caselaw).

The question then becomes whether the subject matter at issue here — to wit, WMATA's public-paratransit operations — is outside the realm of common knowledge, thereby requiring the aid of an expert. Defendant correctly answers that question in the affirmative. To support its

8

position, WMATA points to instructive caselaw within our Circuit. The district court in Robinson, for example, considered a case involving a WMATA Metrobus passenger who alleged an ankle injury suffered as a result of the driver's negligent operation of the vehicle. See 941 F. Supp. 2d at 65–66. The court determined that expert testimony was required "to establish standards regarding the specific procedures that public transit bus operators should follow." Id. at 67. In its view, the standards governing such operations were far "beyond the ken of the average layperson." Id. (quoting Dist. of Columbia v. Arnold & Porter, 756 A.2d 427, 433–34 (D.C. 2000)).

Although not binding, Robinson provides a helpful point of comparison. If expert testimony is necessary to establish the standard of care for standard Metrobus operations, then it is especially significant here. Unlike Metrobus operators, MetroAccess drivers assist passengers with disabilities or special needs. This added responsibility takes such operations even further outside the realm of common knowledge and necessitates the testimony of a competent expert to articulate the governing standard of care.

Plaintiff has not presented any such testimony. See Pl. Opp. at 6–7. Instead, she notes merely that because WMATA is a common carrier, it owed a "higher duty of care to [her father]." Id. at 5. Her observation does not move the needle. True, like any common carrier, the Authority "owes a duty of reasonable care to its passengers." McKethan v. WMATA, 588 A.2d 708, 712 (D.C. 1991). That WMATA is so obligated, however, does not also tell us what kind of duty it owes to its passengers, particularly its disabled ones. See WMATA v. Jeanty, 718 A.2d 172, 175 (D.C. 1998). Of course, the answer to that question depends upon the circumstances — here, the transportation of an elderly man with a walker. Id. ("[A]ll of the decisions recognize that the standard [of care] is always contextual, and that the carrier's relation to, and duties

9

toward, its passengers constitute the critical context in which the carrier's conduct is evaluated."); see also Robinson, 941 F. Supp. 2d at 67 (requiring expert testimony in case involving Metrobus operations). For example, to what degree and in what manner should drivers assist each disembarking disabled passenger? What are their responsibilities vis-à-vis the other passengers remaining on the van? In short, merely pointing out that Defendant is a common carrier does not relieve Bush of her burden to produce expert testimony.

In rejoinder, Plaintiff cites Daskalea v. District of Columbia, 227 F.3d 433 (D.C. Cir. 2000), for the proposition that no expert is required to establish negligence when the conduct at issue is "continuing, persistent, or pervasive." Pl. Opp. at 6. Bush's reliance on Daskalea, however, does her little good. In that case, the court found "a continuing series of evening stripteases, accompanied by blaring music and guard-on-inmate violence [in the D.C. Jail]" to have been so "persistent, open and notorious" that a layperson could "reasonably conclude that the District had been negligent (at best) when it failed to notice, let alone stop" the behavior. Daskalea, 227 F.3d at 445. Plainly, our case is a conceptual world apart from Daskalea. Nothing that happened here is obviously unlawful, and Plaintiff does not point to any evidence that WMATA engaged in a pattern of offensive or improper conduct.

The Court, consequently, concludes that Bush was required to provide expert testimony to articulate the applicable standard of care. Her failure to do so is "fatal to [her] negligence claim." Scott v. Dist. of Columbia, 101 F.3d 748, 757 (D.C. Cir. 1996). That is because without the applicable standard of care, Bush cannot raise a jury question as to whether Defendant deviated from that standard — i.e., breached its duty of care. See Hughes v. Dist. of Columbia, 425 A.2d 1299, 1303 (D.C. 1981) ("Absent such testimony, the jury will be forced to engage in idle speculation which is prohibited.").

Further, regardless of the appropriate standard, all indications in the record are that driver Smith acted appropriately. The evidence shows that when Plaintiff's father exited the bus, Smith instructed him to stop and wait for her to secure the vehicle. See Smith Rep. at WMATA_31; Supervisor Rep. at WMATA_33. Unfortunately, he did not follow her instructions and proceeded toward his front door unescorted. See Smith Rep. at WMATA_31; Supervisor Rep. at WMATA_33. When he stepped on the grass adjacent to the driveway, he tripped and fell. See Smith Rep. at WMATA_31. Aside from generalized conclusions that WMATA somehow breached its duty, Plaintiff never explains how, under the aforementioned facts, this could be the case.

Given the deficiencies chronicled above, summary judgment is warranted. Allison v. Howard Univ., 209 F. Supp. 2d 55, 61 (D.D.C. 2002) (granting summary judgment on negligence claim, in part because plaintiff failed to articulate standard of care or how defendants deviated therefrom).

## IV.  Conclusion

The Court, as a result, will grant Defendant's Motion for Summary Judgment. A separate Order consistent with this Opinion will be issued this day.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date: February 26, 2020